COURT OF APPEALS OF VIRGINIA

Present:   Judges Athey, Fulton and Lorish
Argued by videoconference


MARGIORY HELEN SILVERA

v.      Record No. 0214-25-4

FAIRFAX COUNTY DEPARTMENT                    MEMORANDUM OPINION* BY
  OF FAMILY SERVICES                          JUDGE JUNIUS P. FULTON, III
                                              DECEMBER 16, 2025


JEREMIAS FLORES SANCHEZ

v.      Record No. 0206-25-4

FAIRFAX COUNTY DEPARTMENT
  OF FAMILY SERVICES

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge[1]

Donna L. Biderman (Law Office of Donna L. Biderman, PLLC, on
briefs), for appellant Margiory Helen Silvera.

John J. Woolard (Evan X. Tucker; Heather B. Chaney; Caroline G.
Amarant; McGuireWoods LLP, on briefs), for appellant Jeremias
Flores Sanchez.

Donna R. Banks, Assistant County Attorney; Robin L.
Kozin-Angelo, Guardian ad litem for the minor children (Elizabeth
D. Teare; Kimberly P. Baucom, on briefs), for appellee.


Margiory Helen Silvera (mother) and Jeremias Flores Sanchez (father) appeal the circuit

court's orders terminating their parental rights to their children under Code § 16.1-283(B) and

(C)(2).  They challenge the circuit court's evidentiary rulings and assert that the evidence was

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The Honorable David Bernhard presided over the proceedings below.  Now a member
of this Court, Judge Bernhard took no part in this decision.

insufficient to support termination of their parental rights. Finding no error in the circuit court's judgments, we affirm.

BACKGROUND[2]

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)).

Mother and father are the biological parents to three children, J.F., F.F., and E.F., who were seven, six, and almost three years old at the time of the circuit court hearing in October of 2024—more than two years after the children entered foster care. Mother is also the biological mother to two older children, J.N. and N.M., who were thirteen and nine at the time of the circuit court hearing.[3]

The family first became involved with the Fairfax County Department of Family Services in 2016, when the Department received a report that J.N. and N.M. were mentally and physically abused. That same year, mother asked the Department to place J.N. and N.M. in foster care because she had no place to stay. She was pregnant with J.F. at the time. J.N. and N.M. entered foster care in December 2016. While in foster care, the children and mother had regular visitations and received therapeutic services. J.N. and N.M. returned to mother's custody in June 2018; the Department continued services with the family after mother regained custody.

---

[2] "To the extent that this opinion discusses facts found in sealed documents in the record, we unseal only those facts." *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023).

[3] The JDR court terminated the parental rights to J.N.'s and N.M.'s biological fathers; neither father appealed to the circuit court.

In 2018 and 2019, the Department learned that the children had been exposed to domestic violence between mother and father.  The Department also received a report in August 2019 that F.F. had nearly drowned after mother left the children unsupervised near a pool.[4]   Mother admitted that she left the children unsupervised because she was angry following an argument with father.

In March 2020, the Department received a report that J.F., then three years old, left the home unaccompanied and tried to cross a busy street.  During an unannounced visit, a Department employee observed a bruise on J.N.'s face; J.N. reported that father had hit him.  Mother admitted that she had told the child to hide the bruise under a mask because she was worried about father's immigration status.  The Department obtained protective orders for abuse and neglect against father. The Department required mother and father to each undergo a psychiatric evaluation, receive therapeutic services, and restricted father to supervised visitation with the children.

The Department worked with mother to create a supervision plan and provided mother with a safety gate and cameras.  After learning that mother's home had a bed bug and cockroach infestation, the Department provided mother with eradication services and encasements for the family's mattresses.  The Department also provided the family with home-based services to foster structure, routine, and safety, as well as "to support modification of parenting to meet the children's needs" appropriately.

In July 2022, the Department received another report of domestic violence between mother and father.  Father entered the home and was arrested for violating the protective order. The Department also learned that mother had left E.F. in a car unattended.  The Department removed the children on August 1, 2022.[5]

---

[4] F.F. would have been one-year old at the time of the near-drowning incident.

[5] The children would have been five, four, and nine months old.

Following removal, the Department determined that mother's mental health was unstable. Before she could be reunified with the children, the Department required her to stabilize her mental health, create a stable home environment free from domestic violence, develop an organizational system to manage appointments, and develop effective parenting strategies to respond to the children's emotional and behavioral needs. The Department required father to address his mental health, anger, and domestic violence, use safe and non-physical disciplinary strategies for the children, and learn effective parenting strategies. To meet these goals, the Department provided mother and father numerous services, including parenting classes, counseling services, home-based counseling services, and protection and preservation support.

Dr. Sonal Pancholi Doran, a forensic neuropsychologist, attempted to perform a parental capacity exam on mother, but mother missed the appointment. Dr. Doran observed mother with the children during supervised parent/child sessions and concluded that mother was unable to manage the children's behaviors. Dr. Doran diagnosed mother with Depressive Disorder, ADHD, and Borderline Personality Disorder, and recommended that she receive mental health treatment and parenting education.

Dr. Doran completed a parental capacity examination on father. Dr. Doran had "grave concerns" about father's parenting skills, based on the history of physical abuse and father's reliance on corporal punishment. Father also missed appointments and failed to complete tasks. Based on father's refusal to take accountability for his actions, Dr. Doran found that he was "still functioning in the same manner that he was at the time the kids were removed." Dr. Doran concluded that while in his care, the children would be exposed "to volatile, unstable relationships," as well as "ongoing domestic violence."

Dr. James Steg, a psychiatrist, completed a psychiatric evaluation of mother. Dr. Steg prescribed mother with antidepressants, but she did not regularly comply with the medication

management and her mood and behavior continually deteriorated. Mother missed several regularly scheduled appointments. After the Department removed the children, mother missed the next four appointments. When mother finally returned, she informed Dr. Steg that she had stopped taking her medications and injured herself. Dr. Steg opined that mother needed more progress to meet the Department's goals. Dr. Steg also performed a psychiatric evaluation on father. Dr. Steg recommended that father continue with domestic violence therapy, individual therapy, and anger management classes.

Both mother and father made some progress in their foster care goals. Mother engaged in some of the therapy sessions, psychiatric appointments, and supervised visitations. Mother initially complied with medication management but later stopped taking her medicine for a period. In September 2022, mother attempted suicide, which led to an inpatient hospitalization. Father completed the Anger and Domestic Abuse Prevention and Treatment Program (ADAPT), participated in outpatient therapy and father engagement sessions, and attended supervised visitations.

Still, the Department determined that neither parent had demonstrated "the ability to make healthy decisions and choices that affect the safety, wellbeing, and permanency of the children." The Department changed the foster care goal to adoption. A "significant factor" in the Department's change of goals was mother and father's decision to reunite in June 2023, after previously denying that intention.[6] The Department had told mother and father that it would change the foster care goal to adoption if they sought to reunite. J.N. and N.M. had conveyed at that time that they did not feel safe living with father.

During their reunification, both mother and father made allegations of domestic violence against each other. Their participation in services also declined. Mother began having

---

[6] Mother and father had ended their relationship following E.F.'s October 2021 birth.

difficulties preparing for some of her visits, was late to some appointments, and spent much of the home-based counseling sessions discussing concerns about father. Mother also presented significant mental health symptoms; she spent three weeks receiving inpatient care, during which she was unable to see the children or participate in any services. Mother's employment was also unstable. She had moved in with her sister because she could not pay her bills and had no electricity in her home. The Department concluded that "despite several years of services, the issues that brought the children into foster care [were] still present and impacting [mother's] ability to be a safe, stable, and permanent caregiver for the children."

For his part, father struggled to supervise his children and continued to rely on physical violence, requiring the Department's intervention during supervised visitations to protect the children. Father hid his intention to reunite with mother from the Department, and continued to inflict violence against mother, even after he completed the program.

After years of providing services, in 2024, the Department determined that mother and father had failed to address the underlying issues that led to the initial intervention. Based on continued concerns about lack of supervision and domestic violence, the Department petitioned to terminate mother and father's parental rights and to change the foster care goal to adoption. The Fairfax County Juvenile and Domestic Relations District Court terminated mother and father's parental rights and approved the goal of adoption. Mother and father appealed to the circuit court.

During the circuit court hearing, Cheryl Wietz, a clinical social worker, described trauma assessments she conducted on the children. The children "reported on the domestic discord and the domestic disruptions that they were exposed to and how that terrified them." Wietz diagnosed the four older children with post-traumatic stress disorder. Based on his history of domestic violence, Wietz opined that father would be unable to successfully complete a program

designed to teach him how to support the children and remain calm. Likewise, due to mother's history of trauma, Wietz testified that she would be unlikely to complete the program as well. Based on her observations of the family, Wietz concluded that the children would not be safe with mother or father.

Martia Myers de Pina, a licensed family therapist, first worked with the mother and N.M. in 2021. While N.M. lived with mother, he missed approximately 60% of the appointments; after entering foster care, he missed no sessions. Myers de Pina diagnosed N.M. with disinhibited attachment disorder of childhood, ADHD, and adjustment disorder, and opined that he needed a safe and predictable environment to heal.

Heather Bernhard, a licensed professional counselor, worked with F.F. and diagnosed him with adjustment disorder with mixed disturbance of conduct and emotions. F.F. had emotional outbursts and physically aggressive behaviors. His conduct improved with counseling, and Bernhard recommended continued therapeutic services. Bernhard testified F.F. needed consistency, structure, and reliability in his life.

During the hearing, the Department offered Megan Mossburg as an expert witness in home-based counseling and treatment. She had an undergraduate degree in psychology and a master's degree in clinical mental health counseling. Mossburg received specialized training in the Positive Behavior Support Model, which involved working with parents and children to develop skills necessary for positive behavior to maintain safety and stability. She had worked as a home-based counselor with approximately 50 individuals at the time of trial; half of those involved abuse and neglect. Mossburg had previously testified as an expert. Mother and father objected to her testimony, arguing that Mossburg did not qualify as an expert. The circuit court found that Mossburg's credentials were sufficient and qualified her as an expert.

Mossburg testified that in 2022, she began working with the two older children as a home-based therapist to assist them with foster care stability. She began working with J.F., E.F., and F.F. in April 2023. Mossberg also observed mother's supervised visits with the children, which caused the children's behavior to regress. Mossburg opined that the children needed a consistent and predictable caregiver who could implement structure and routine, and model emotional regulation and safety.

Esperanza Pham, an in-home counselor, also oversaw supervised visitations between the parents and the children. During the visits, mother failed to set boundaries and limits with the children. Pham offered mother instruction as to how to handle the children, but mother was inconsistent with following through on the suggestions. Father did not listen to Pham's instructions; on three occasions he became very angry in front of the children. For a short period of time, the supervised visitations occurred in father's home. Father was late for some of the visitations. Once, the police came to father's house for an unrelated issue; the children were scared because they "were already traumatized with domestic violence." One child asked Pham if the police were going to remove father again. After this incident, visitation at his home stopped and visits reverted to the Department's offices.

On the second day of trial, the Department advised the circuit court of their remaining witnesses noting that Ashley Stright would testify. Stright had filed the petitions for the termination of mother and father's parental rights on behalf of the Department. Mother and father objected to Stright's testimony and moved for a mistrial, arguing that she had violated the Rule on Witnesses because she had remained in the courtroom during the trial.[7] The circuit court

---

[7] Stright had been in the courtroom during the testimony of all the Department's witnesses, including the experts, acknowledging that "all of that information is information that I already had *even before this trial started*." (Emphasis added).

denied the motion and concluded that Stright was an agent of the Department with the right to be present during the proceedings.

The next day, mother and father learned that Stright was no longer employed by the Department, so they renewed their motion for a mistrial. Stright had left her employment with the Department one week before the hearing. After lengthy argument from counsel, the circuit court stated that "without ruling whether she is or is not an agent, in an abundance of caution, I'm going to exclude her from being present for the rest of the trial." In light of the ruling, the Department argued Stright was an expert witness and under that guise should be permitted to remain in the courtroom. Ultimately, the circuit court determined that Stright was not an agent as she was no longer employed by the Department, but concluded that she was an expert "under Rule 2:703" and "for those reasons, she may remain [in the courtroom]."

Stright testified that she previously worked as a Foster Care Specialist for the Department and was the assigned social worker for all of the children when they entered care. She detailed the services that mother and father were required to complete. Stright was also responsible for filing the foster care service plans for the parents and the children. Stright described the contents of the plans, including the foster care goals, requirements expected of the parents, services provided to the parents and the children, and details of the family partnership meetings. Stright compiled the information in the reports, including gathering their observations, diagnoses, and recommendations from treatment providers. Stright also participated in more than 11 family partnership meetings with the family.

Father testified that he had completed therapy. Father admitted that he had missed some visitations with the children, but blamed work obligations or personal matters. Mother testified that she had a loving relationship with the children. She described her relationship with father as "toxic" and acknowledged the negative impact it had on the children. She was in therapy, but

missed some appointments because she did not have transportation. Mother acknowledged that she and father had a domestic violence incident when they reunited in 2023.

The children thrived in foster care. They all benefited from participation in individual counseling and received regular medical and dental care. Both J.N. and N.M. benefited from practicing Jiu-Jitsu. J.N. and N.M. received special education services in school and had set many goals for the school year. J.F. enjoyed reading, gardening, and drawing and had excelled in school. F.F.'s behavior had improved since entering foster care. F.F. enjoyed riding bikes, attended day care, and participated in a summer camp program. E.F. received individual attention from the foster parents, and enjoyed playing outside, going to the library, and taking music classes. E.F. demonstrated language delays but had benefited from speech therapy.

At the conclusion of the hearing, the circuit court terminated mother and father's parental rights pursuant to Code § 16.1-283(B) and (C)(2) and approved the foster care goal of adoption. Both mother and father appeal.

## ANALYSIS

"On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce*, 75 Va. App. at 699 (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

## I. Rule on Witnesses/Expert Witness - Stright

"The court trying any civil case . . . shall upon the motion of any party, require the exclusion of every witness." Code § 8.01-375.[8] "[T]he purpose of the statute is to 'discourage and expose fabrication and collusion by witnesses and to minimize the likelihood that witnesses will alter their testimony so that such testimony is consistent with testimony provided by other witnesses.'" *Galiotos v. Galiotos*, 300 Va. 1, 15 (2021) (quoting *Motley v. Tarmac Am., Inc.*, 258 Va. 98, 101-02 (1999)). But enforcement of the Rule after a witness has violated it is left to the trial court's discretion.

### A. *Abuse of discretion*

Even if a witness violates the Rule on Witnesses, it is within the circuit court's discretion to determine if that witness "should be prohibited from testifying." *Ndunguru v. Commonwealth*, 73 Va. App. 436, 443 (2021) (quoting *Wolfe v. Commonwealth*, 265 Va. 193, 214 (2003)). A circuit court abuses its discretion in one of "three principal ways": (i) "when a relevant factor that should have been given significant weight is not considered;" (ii) "when an irrelevant or improper factor is considered and given significant weight;" or (iii) "when all proper factors, and no improper ones are considered, but the court, in weighing those factors, commits a clear error of judgment." *Id.* at 444 (citing *Galiotos*, 300 Va. at 11). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Bista v. Commonwealth*, 303 Va. 354, 370 (2024) (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

---

[8] Also referred to as the Rule on Witnesses or the Rule.

Mother and father argue that the circuit court erred in failing to declare a mistrial or exclude Stright's testimony altogether because hearing the testimony of the other witnesses influenced her testimony. But the parties do not identify any relevant factors that should have been given significant weight but which were not considered by the circuit court. They do not identify any improper factors considered by the circuit court which were given significant weight. At most, they argue the circuit court committed "a clear error of judgment" when it allowed Stright to remain in the courtroom as an expert over the objection of mother and father. Stright's testimony was, at most, cumulative of the other witnesses' testimony insofar as she testified that it was all "information . . . I already had *even before this trial started*." (Emphasis added). The record does not show anything any other witness said that influenced her opinion at trial. Even assuming her presence while other witnesses testified violated the Rule on Witnesses, exclusion was not automatic; the circuit court had the discretion to weigh the equities and prejudices to the parties. *Ndunguru*, 73 Va. App. at 443-44.

B. *Prejudice*

In deciding whether a witness who violates an exclusion order should be prevented from testifying, a trial court's consideration should also "include whether prejudice will result to the defendant and whether the violation of the rule resulted from intentional impropriety." *Jury v. Commonwealth*, 10 Va. App. 718, 721 (1990). Nothing in the record supports the argument that any other witnesses' testimony influenced Stright's testimony. Indeed, Stright was the individual who had filed the petitions seeking termination of mother and father's parental rights. There is no evidence that the Department intentionally had Stright remain in the courtroom to gain some advantage or intentionally failed to advise the court or the parties she was there.

In response to mother and father's argument that there was "serious prejudice to my client's rights here, because [Stright] saw everything," while the circuit court made no specific finding of

prejudice in this case, it found that "[Stright] has [not] . . . really gained anything that she didn't already know. A lot of what's been testified to has been covered in reports. So there's not really much new here so far that she's listened to . . . ."

Here, there was no prejudice to mother and father. Stright's testimony mostly detailed the contents of the foster care services plans which were written well before trial. She testified she already had all the information that was being testified to well prior to trial. Stright's position before trial was that mother and father's parental rights should be terminated. She did not deviate from that position even after listening to all the other witnesses testify. The purpose of the Rule on Witnesses is to prevent witnesses from adjusting their testimony in light of other evidence; that concern is negated when the testimony involves the details of reports written and submitted before trial. Accordingly, there is no basis in the record to conclude that Stright's testimony was impacted merely because she was present while others testified.

C. *Expert testimony under Code § 8.01-375 requires consent by all parties*

Yet, that does not end our inquiry for purposes of the statute.[9] Subject to two exceptions not applicable here, Code § 8.01-375 also provides that "[w]here *expert* witnesses are to testify in the case, the court may, at the request of *all parties*, allow one expert witness for each party to remain in the courtroom." (Emphases added). While the circuit court found that Stright was qualified as an expert, the record is clear that all parties did not agree to her continued presence as required by the statute. The circuit court therefore abused its discretion when it permitted Stright to remain in the courtroom. Even so, where it is plain that the parties "have had a fair trial on the merits and substantial justice has been reached," the judgment "shall [not] be arrested or reversed . . . [f]or

---

[9] Father was the only party who assigned as error that the circuit court erred "by permitting . . . Stright to remain in the courtroom as an expert under Code § 8.01-401.1 without the agreement of all parties as required under § 8.01-375." Even where the Rule on Witnesses is invoked, only where there is agreement by all the parties are experts exempted from application of the Rule.

any . . . defect, imperfection, or omission in the record, or for any error committed on the trial." Code § 8.01-678(2); *Lavinder v. Commonwealth*, 12 Va. App. 1003, 1005, 1011 (1991).

During voir dire to determine her qualifications as an expert, Stright did testify that it was "essential" for her to listen to "all of the information that was gained through those other [witnesses]" in order for her to "move forward" as far as providing recommendations for other types of services or treatment "to support the Foster Care Service Plans." She acknowledged, however, that "all of that information" was "information that [Stright] already had even before this trial started." Moreover, even though Stright was qualified as an expert witness, the Department failed to elicit any expert opinion from her, effectively making her a fact witness rather than an expert witness.

Here, the trial court did not need to hear an expert opinion from Stright given the overwhelming evidence from the other witnesses and her own fact testimony.[10] Considering the factors set out in *Ndunguru*, *supra*, we conclude that error was harmless especially when considering the strength of all the testimony and given the standard of deference this Court must give to the "primary decisionmaker's judgment," *Thomas*, 73 Va. App. at 127, the evidence in this case overwhelmingly supported the decision to terminate the parties' parental rights. "An error does not affect a verdict if a reviewing court can conclude . . . that, had the error not occurred, the verdict would have been the same." *Castillo v. Loudon Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 564 (2018) (alteration in original) (quoting *Lavinder*, 12 Va. App. at 1006); *see*

---

[10] In sum, the Department had attempted for years to work with mother and father to correct their behavior towards their children and each other using various expert and parenting services to no avail. The children had been in foster care for over two years prior to the trial and were well-adjusted in their new environments. The trial court found that the mother and father were "unable to provide [the children] with what they need, and we need to give them a chance to succeed." The trial court noted it was "mandated to do . . . what [was] best for these kids, and what is best for these kids is what has been proven by the County," finding the case for termination of parental rights had been proven by clear and convincing evidence.

*Bond v. Commonwealth*, 226 Va. 534 (1984) (holding that error in the admission of expert opinion may be harmless when the other evidence of guilt is overwhelming). Therefore, while we find that though the circuit court abused its discretion in permitting Stright to remain as an expert in the courtroom without consent of all the parties as required by statute, that error was harmless.

## II. Expert Testimony - Mossburg

"It is well-settled that '[d]ecisions regarding the admissibility of evidence "lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion."'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (alteration in original) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). Whether to admit or exclude expert testimony is similarly "a matter within the sound discretion of the circuit court, and we will reverse the circuit court's judgment only when the court has abused this discretion." *Lucas v. Riverhill Poultry, Inc.*, 300 Va. 78, 92 (2021).

A witness determined by a court to be an expert must be "qualified as an expert by knowledge, skill, experience, training, or education" on the subject. Va. R. Evid. 2:702(a)(i). An expert must have a degree of knowledge "beyond that of persons of common intelligence and ordinary experience." *Wakeman v. Commonwealth*, 69 Va. App. 528, 536 (2018).

Mother and father assert that the trial court erred by qualifying Megan Mossburg as an expert witness. Mossburg had received her undergraduate degree in psychology and a master's degree in clinical mental health counseling. She had received specialized training in the Positive Behavior Support Model, from which she learned how to help parents develop specific skills to maintain safety and stability. Mossburg had worked with approximately 25 families in abuse and neglect situations, and had received regular training and education on this subject. Mossburg had been certified as an expert in an earlier matter. Given her specialized knowledge and experience,

we find no abuse of discretion in the circuit court qualifying her as an expert witness in home-based counseling and treatment.[11]

### III. Termination of Parental Rights

The circuit court terminated mother and father's parental rights under Code § 16.1-283(B) and (C)(2).[12] Terminations under Code § 16.1-283(B) and (C)(2) provide distinct, "individual bases upon which a petitioner may seek to terminate residual parental rights." *City of Newport News Dep't of Soc. Servs. v. Winslow*, 40 Va. App. 556, 563 (2003). "[I]n 'situations in which there [are] one or more alternative holdings on an issue,' the appellant's 'failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue.'" *Johnson v. Commonwealth*, 45 Va. App. 113, 116 (2005) (quoting *United States v. Hatchett*, 245 F.3d 625, 644-45 (7th Cir. 2001)). "That said, we still must satisfy ourselves that the alternative holding is indeed one that (when properly applied to the facts of a given case) would legally constitute a freestanding basis in support of the trial court's decision." *Id.* at 117. "But, in making that decision, we do not examine the underlying merits of the alternative holding—for that is the very thing being waived by the appellant as a result of his failure to raise the point on appeal." *Id.*; *see also Ferguson*

---

[11] Father also alleges that Mossburg's testimony was unrelated to the issues for which she was qualified an expert. But father did not raise that objection in the circuit court. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. He does not invoke any of the exceptions to Rule 5A:18, and we do not raise them sua sponte. *Spanos v. Taylor*, 76 Va. App. 810, 828 (2023). Thus, this argument is waived, and we do not address it. *See Hogle v. Commonwealth*, 75 Va. App. 743, 755 (2022).

[12] We note that mother challenges only termination under Code § 16.1-283(B). Mother's failure to challenge the termination under Code § 16.1-283(C)(2) renders her assignment moot; even if we found insufficient evidence under subsection (B), her parental rights would remain terminated under subsection (C)(2). *See Johnson v. Commonwealth*, 45 Va. App. 113, 116 (2005) (failure to address alternative holdings renders an assignment moot). And we will not consider issues omitted from the assignments of error. Rule 5A:20.

*v. Stokes*, 287 Va. 446, 452-53 (2014); *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 422 (2012).

Code § 16.1-283(C)(2) authorizes a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (alteration in original) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). The statute "requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he [or she] has been offered rehabilitation services." *Toms*, 46 Va. App. at 271.

The Department provided numerous therapeutic services to this family between 2016 and 2023. Yet, the children were still exposed to domestic violence between mother and father. The children were often unsafe while in their parents' care; for example, F.F. nearly drowned after being left unsupervised by a pool, F.F. was located unaccompanied by a busy road, and father had struck J.F. in the face. Although mother and father had participated in many services, that participation declined in 2023 around the same time mother required inpatient mental health care. Mother acknowledged that her relationship with father negatively impacted the children, but still reunited with him years after the Department became involved with the family. During their reconciliation, mother and father continued to engage in acts of domestic violence. Father did not take accountability for his actions, and Dr. Doran concluded that he was a threat to the children. The

- 17 -

evidence in the record demonstrates that although the family had the benefit of seven years of services, neither mother nor father had remedied the circumstances that led to the children's placement in foster care.

The record also supports the circuit court's holding that adoption was in the best interests of the children. "'[T]here is no simple, mechanical, "cut and dried" way' to apply the best interests of the child standard." *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 48 (2014) (quoting *Peple v. Peple*, 5 Va. App. 414, 422 (1988)). "Instead, '[t]he question must be resolved . . . in light of the facts of each case.'" *Eaton v. Wash. Cnty. Dep't of Soc. Servs.*, 66 Va. App. 317, 331 (2016) (alterations in original) (quoting *Toombs v. Lynchburg Div. of Soc. Servs.*, 223 Va. 225, 230 (1982)).

Here, the record includes evidence that the children thrived in foster care. They each benefited from medical and therapeutic care, and their mental health and behaviors had improved since they entered foster care. The children also engaged in activities that they enjoyed. At the time of the circuit court hearing, the children had been in foster care for over two years. "[I]t is in the best interests of children to receive a permanent placement without languishing in the foster system." *Simms*, 74 Va. App. at 464. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Id.* at 463 (quoting *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 162 (2004)). Thus, we cannot say that the circuit court erred in finding it was in the best interests of the children to terminate mother and father's parental rights under Code § 16.1-283(C)(2) and approve the foster care goal of adoption.[13]

---

[13] Father also contends that the circuit court erred in finding the evidence sufficient to terminate his residual parental rights under Code § 16.1-283(B). But "[w]hen a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo*, 68 Va. App. at 574 n.9; *see also Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 8 (2005) (affirming termination of

CONCLUSION

For the foregoing reasons, the circuit court's judgments are affirmed.

*Affirmed.*



residual parental rights under one subsection of Code § 16.1-283 and declining to address termination under any other subsection relied upon by the circuit court). Having found that the circuit court did not err in terminating father's residual parental rights to his three minor children under Code § 16.1-283(C)(2), we need not address whether father's residual parental rights were also properly terminated pursuant to Code § 16.1-283(B).